**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**



- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

Rebecca Bar-Tur,                                        :
                                    Plaintiff,          :
                                                        :
          -against-                                     :    MEMORANDUM DECISION
                                                        :    AND ORDER
Arience Capital Management, L.P., Arience               :    09 Civ. 2653 (GBD)
Associates, L.L.C. and Caryn Seidman-Becker,           :
                                                        :
                                   Defendants.          :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

GEORGE B. DANIELS, District Judge:

Plaintiff Rebecca Bar-Tur brings this action against Defendants Arience Capital
Management, L.P., Arience Associates, L.L.C. and Caryn Seidman-Becker alleging breach of
contract and discrimination on the basis of a disability. Defendants move for summary judgment
pursuant to Fed. R. Civ. P. 56. Defendants' motion for summary judgment is granted.

### Factual History

In February 2007, Rebecca Bar-Tur ("Bar-Tur") left her position as a managing director
of Morgan Stanley and joined Arience Capital Management ("Arience") as a Senior Analyst and
Limited Partner. Amended Compl. ¶ 8; Chinn Decl. Ex. 12 at 1; Chinn Ex. 1 at Tr. 17:16-23. She
reported to Caryn Seidman-Becker ("Seidman-Becker"), who was also the General Partner of
Arience LP. Chinn Decl. Ex. 1 at Tr. 73:22-24; Chinn Decl. Ex 2 at Tr. 93:14-14. She was
discharged from that position in November 2008. Because of the unstable economy, Arience
decided to close in December 2008 and actually closed a few months later. Seidman-Becker Aff.
¶ 11. Arience distributed no management fees to any of the limited partners. It did distribute
varying amounts of severance payments to departing employees. Chinn Decl. Ex. 3 at Tr. 95:23-
96:9.

## Agreements

Immediately before starting at Arience, Bar-Tur executed a letter agreement ("Letter Agreement"). Chinn Aff. Ex. 12. The agreement holds in pertinent part:

> 3. You will be admitted as a limited partner of the Management Company and a non-managing member of the LLC.
>
> 5. <u>Compensation</u>.
> ...
> Commencing as of March 1, 2007 in accordance with Section 3.04 of the LP Agreement, you will be eligible to have a Management Percentage (as defined under the LP Agreement) allocated to you. Your initial Management Percentage will be at least 5.00% . . ..The Management Percentage shall be distributed in accordance with the LP Agreement. Except as otherwise provided under the LP Agreement, you will not be entitled to any payment or allocation in respect of the Management Percentage unless you are employed by the Management Company at the time (I) the Management Company receives such amounts, and (ii) the Management Company allocates such amounts to other Limited Partners.
> ...
> 7. <u>Employment at Will</u>. Nothing in this Letter Agreement shall be construed or interpreted to establish a definite term for your employment. Your employment by the Management Company will be "at will". . .. <u>Id</u>. at 1-2.

According to the Letter Agreement, Bar-Tur initially had an Incentive Percentage and Management Percentage of 5.00%. <u>Id</u>. Both increased to 6.70% in 2008. <u>Id</u>. The Limited Partnership Agreement of Arience Capital Management LP, which the Letter Agreement is made explicitly pursuant to, states that distributions "may be made to the Partners, in the discretion of the General Partner." Chinn Decl. Ex. 10 at 15.

## Performance

Early in her time at Arience, Bar-Tur generally performed well. She received a good performance review from Ms. Seidman-Becker. Bar-Tur Aff. ¶ 7; Chinn Ex. 2 at Tr. 94:2-3. For example, near the end of 2007, after Bar-Tur had been working at Arience for approximately six

2

months or so, Seidman-Becker told Bar-Tur that "everyone is so excited to have you as a partner – you are like a hand in glove fit." Chinn Decl. Ex. 17.

However, Seidman-Becker later expressed disappointment with some aspects of Bar-Tur's performance. See e.g., Chinn Decl. Ex. 16; Ex 1. at Tr. 93:18-25; Ex 2 at Tr. 94:20-25.  As frustration over Bar-Tur's performance grew, Seidman-Becker began discussing with Mitch Rubin the possibility of him joining Arience to replace Bar-Tur. Chinn Decl. Ex. 2 at Tr. 192:4-15. Seidman-Becker felt that, at the time, Bar-Tur could not fill the senior role for which she had been hired. Id.

### Compensation

Ms. Bar-Tur received an annual salary of $225,000. Chinn Decl. Ex. 26. In the middle of 2007, she received $2,838.20 in net management fees and $809,016 in incentive allocations. Chinn Aff. Ex. 26 at 2. At the end of 2007, she received $278,860 in Net Management Fees; $416,604 in base Incentive Allocation and $125,000 in additional Incentive Allocation; and $62,500 in a Deferred Bonus Award. Id. at 1. She received $1,923,336 in total compensation for 2007. Chinn Decl. Ex. 1 Tr. 79:4. In 2008, Bar-Tur received her base salary and several tax distributions; she did not receive any management or incentive distributions. Chinn Aff. Ex. 1 at Tr. 72:1-8; Ex. 69. No limited partner received any management or incentive distributions in 2008. Id.

### Health

Plaintiff had health issues during her entire tenure at Arience. Bar-Tur Decl. ¶ 1; Chinn Decl. Ex. 2 at Tr. 114:4-21.  She initially believed she had recurring sinus infections. Bar-Tur Decl. at ¶ 15. In August 2007, she had sinus surgery. Chinn Decl. Ex. 1 at Tr. 225:12-25. She saw a number of doctors to try and figure out what was wrong with her. Bar-Tur Decl. ¶ 17,

3

Chinn Decl. Ex. 28, 34, 37. Each doctor reported that she had a sinus infections approximately

every month. See Chinn Decl. Ex. 28, 34, 37; Bar-Tur Decl. Ex. L.  In February 2008, her doctor

preliminarily diagnosed her with Common Variable Immunodeficiency ("CVID"). Chinn Decl.

Ex. 26 at 2.  Bar-Tur told Seidman-Becker of her diagnosis around February 20, 2008. Chinn

Decl. Ex. 1 at Tr. 251:19-22.

CVID is deficiency of the immune system, which reduces the amount of antibodies that

Bar-Tur produces. Bar Tur Decl. ¶ 18. She is more likely to become sick than the average

person. Id. Bar-Tur has occasional trouble breathing, sleeping and speaking. Bar-Tur Decl. ¶¶

19-22.  For example, at the firm's Christmas party, she was supposed to participate in a skit but

was unable to do so because she had a coughing fit. Id. Seidman-Becker and others were aware

of her health issues. See e.g., Chinn Ex. 53; Ex. 38; Ex. 33; Ex. 27. It is clear that Bar-Tur

openly shared her health problems with Seidman-Becker. See id.

Bar-Tur began immunoglobulin ("IVIG") treatment in mid-2008. See Bar-Tur Decl. ¶ 23;

Chinn Decl. Ex. 1 at Tr. 254:3-25.  IVIG reduces the frequently and severity of her sinus

infections. Chinn Decl. Ex. 1 at Tr. 284:9-1; 303:2-10.

### Bar-Tur's Dismissal

On September 8, 2008, Siedman-Becker told Plaintiff that she was not working out at

Arience, that she needed to put more time into her job, and that Bar-Tur could either terminate

her employment with Arience or Seidman-Becker would redefine Bar-Tur's role by either

demoting her to Junior Analyst or putting her in charge of Investor Services. Bar-Tur Decl. ¶ 34;

Chinn Decl. Ex 1 at Tr. 283:25 - 284:6. In response to Seidman-Becker's statement, Bar-Tur said

that she could not work from "5 am to midnight but only from 6 am to 10 pm and that her health

and family had to come first." Chinn Decl. Ex. 1 at Tr. 284:9-13. At the time, Bar-Tur

understood that she could not stay in her current role at Arience. Chinn Decl. Ex. 1 at Tr. 286:14-24.

On October 1, 2008, Seidman-Becker stripped Bar-Tur of her right to a portion of management fees. That evening, Seidman-Becker wrote Bar-Tur an e-mail which stated: "the next 6-9 months is supposed to be a positive opportunity for you to learn and complete the transition to the buy side. It is also supposed to be a personal opportunity for you to take care of some important things in your life. I know it is never great to take a step back but it is a short-term step for long-term growth." Chinn Decl. ¶ 38; Chinn Decl. Ex. 60. On October 29, 2008, Bar-Tur got a letter explaining Arience's intention to revoke Bar-Tur's management allocation, incentive allocation and net management fees. Id. at Ex. 63.

On November 4, 2008, Counsel for Bar-Tur sent an e-mail to Mike Gennaro, the Chief Financial and Operating Officer of Arience, stating that: "We have deep concerns that Arience is seeking to alter the terms and conditions relating to Ms. Bar-Tur's employment after she raised issues related to her medical condition . . ..We also have concerns that Arience is seeking to avoid paying compensation to Ms. Bar-Tur which she has labored throughout 2008 to receive. We have received the October 29, 2008 letter. Ms. Bar-Tur will not sign that letter." Chinn Decl. Ex. 65. That same day, Ms. Bar-Tur was told to go home and her access to her office, e-mail and voicemail were terminated. Bar-Tur Decl. ¶ 44. Bar-Tur understood that she was terminated at that time because she refused to accept Arience's terms. Chinn Decl. Ex. 1 at Tr. 331:5-9. On November 6, 2008, Arience sent Bar-Tur a letter memorializing Bar-Tur's termination and offering her $50,000 to waive all claims against the company and individual officers. Chinn. Decl. Ex. 77. Bar-Tur refused to sign the agreement. Bar-Tur Decl. ¶ 45.

### Standard of Review

Summary judgment is appropriate where the evidence, viewed in the light most favorable to the non-moving party, shows "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); Vacold, L.L.C. v. Cerami, 545 F.3d 114, 121 (2d Cir. 2008). The burden rests upon the moving party to show that there is no genuine issue of material fact. See Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). A fact is "material" only where it will affect the outcome of the suit under governing law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). For there to be a "genuine" issue about the fact, the evidence must be such "that a reasonable jury could return a verdict for the nonmoving party." Id. In determining whether there is a genuine issue of material fact, the Court is required to resolve all ambiguities and draw all inferences in favor of the non-moving party. Sec. Ins. Co. of Hartford v. Old Dominion Freight Line, Inc., 391 F.3d 77, 83 (2d Cir. 2004). Where there is no evidence in the record "from which a reasonable inference could be drawn in favor of the non-moving party on a material issue of fact," summary judgment is proper. Catlin v. Sobol, 93 F.3d 1112, 1116 (2d Cir. 1996).

### Breach of Contract

Bar-Tur contends that she is owed $200,000 because under her employment agreement she is owed a fixed share of management fees. It is undisputed that Arience paid no management fees to the other limited partners. It is also undisputed that Arience paid severance to many of its employees once it decided to cease operations. Bar-Tur contends that these severance payments were in actuality disguised management allocations.

On a motion for summary judgment on a breach of contract claim, the Court must first determine whether the contract is unambiguous with respect to the parties' dispute. Law Debenture Trust Co. v. Maverick Tube Corp., 595 F.3d 458, 465 (2d. Cir. 2010) (citations omitted). This is a question of law solely for the Court. Id. A contract is unambiguous when it has a "definite and precise meaning, unattended by danger of misconception in the purport of the contract itself, and concerning which there is no reasonable basis for a difference of opinion. Id. If the contract is unambiguous, then judgment as a matter of law is appropriate. Id.

Here, the contract is unambiguous because it has a definite and precise meaning. Bar-Tur's Letter Agreement states: "Commencing as of March 1, 2007, in accordance with Section 3.04 of the LP Agreement, you will be eligible to have a Management Percentage (as defined under the LP Agreement) allocated to you . . ..*the Management Percentage shall be distributed in accordance with the LP Agreement*. You will not be entitled to any payment or allocation in respect of the Management Percentage unless you are employed by the Management Company at the time (i) the Management Company receives such amounts; and (ii) *the Management Company allocated such amounts to other Limited Partners*." Chinn Ex. 12 at 2. (emphasis added). Section 3.04 of the LP Agreement states in relevant part that "[t]he 'Management Percentage' of a Partner shall be . . . as determined from time to time by the General Partner in its sole and absolute discretion, and may be modified by the General Partner at any time . . .." Chinn Ex. 13 at 12. Section 4.04, labeled "Distributions" states: "Distributions may be made to the Partners, in the discretion of the General Partner, as soon as practical after the end of each fiscal year." Chinn Ex. 13 at 15.

These contract provisions are clear, and it is clear that Bar-Tur is not entitled to any management fee under her Letter Agreement because no other limited partner received such a

7

fee at the end of 2008 and she was not employed by the company at the time the severance was paid.[1]

Bar-Tur contends that Section 4.04 of the Limited Partnership agreement does not apply to her and that only Section 3.04 applies because her Letter Agreement specifically mentions Section 3.04. This defies the plain meaning of the contract. First, in that same section of her Letter Agreement, the contract states that "[t]he Management Percentage shall be distributed in accordance with the LP Agreement." Chinn Aff. Ex. 12 at 2. It does not limit the method of distribution solely to Section 3.04 of the LP Agreement, as Bar-Tur contends; rather, it incorporates the entire agreement. Second, Section 3.04 is not relevant in establishing how Management Fees are *distributed,* but rather it is relevant in determining what the Management Percentage is in the first instance. By its plain meaning, Section 3.04 of the LP agreement merely establishes how Bar-Tur's initial 5% management fee was determined. See Chinn Aff Ex. 11 at 11-12. Therefore, the specific reference to Section 3.04 in Bar-Tur's letter agreement does not effect how and when Bar-Tur was to received a specific management fee distribution. Rather, it only effected how much of the management fees she was entitled to. See id.

In the alternative, Bar-Tur attempts to recast subsequent severance payments to other limited partners upon dissolution of the firm, as disguised management percentage distributions. However, Bar-Tur proffers no evidence in support of such a conclusion. In fact, counsel for Bar-Tur admitted as such during oral argument: "The Court: You don't have any evidence at all that

---

[1] Plaintiff contends that because she was terminated because of her disability she is entitled to distributions even though she was not employed at Arience at the time the severance payments were made. Given that Plaintiff was not terminated because of her disability, see infra, this argument does not overcome the clear and precise language of the contract requiring that she be employed at Arience at the time any such distributions are made. See Chinn Ex. 12 at 2.

indicates that some decision was made to cast management percentage as severance, is that accurate? Mr. Gutfleisch: Yes." Transcript of September 1, 2010 Oral Argument at 182:22-25. On the contrary, the record does demonstrate that the severance payments made in December 2008 were just that – severance payments. Seidman-Becker, as General Partner of Arience, made the decision in December 2008 to close Arience Capital. Seidman-Becker Aff. ¶ 11, Chinn Ex. 2 at Tr. 320:7-25, 321:1-12. She used Arience's remaining assets to pay for continuing expenses and severance payments. These severance payments to current limited partners bore no relationship to their respective management percentages. For example, both Employees N and P had .25 percent management percentage, yet Employee N received a final payout of $8,000 and Employee P received a final payout of $70,833.0. Def. 56.1 ¶ 71. This strongly undermines Bar-Tur's otherwise unfounded accusation that Arience sought to avoid its obligations to Bar-Tur by recasting management allocations as severance payments.

Because Bar-Tur's contract with Arience is unambigious and was not breached, Arience is entitled to summary judgment dismissing Bar-Tur's contract claims.

### Quasi-Contract Claims

Arience is entitled to summary judgment on Bar-Tur's unjust enrichment and quantum meruit claims. Under New York law, whose application is undisputed, the existence of a written express agreement precludes a claim for unjust enrichment and quantum meruit for claims arising out of the same subject matter. Clark-Fitzpatrick v. Long Island, 70 N.Y.2d 382, 387 (1987).

Bar-Tur's cites a string of cases for the proposition that when in an employment contract, an employer retains the absolute right to award bonuses a Court will not enforce such provisions. See e.g., Xu v. J.P. Morgan & Co., 01 Civ 8686 (S.D.N.Y. September 23, 2003). Those cases are

distinguishable from Bar-Tur's situation. First, Bar-Tur is not an employee but a partner in a limited partnership. See id. Second, the cases cited involve incentive-based bonuses while Bar-Tur is seeking a distribution of management fees under both an employment contract and a Limited Partnership agreement. See id. Regardless, a court can enforce such terms when it "constitutes a term of employment and 'there exists a reasonable basis for calculating the bonus due to the employee.'" Canet v. Gooch Ware Travelstead, 917 F. Supp. 969, 985 (E.D.N.Y. 1996)(citation omitted). Bar-Tur's right to management fees was a term of employment embodied in her employment agreement. Further, there was a reasonable basis for calculating any such "bonus" due to Bar-Tur since her agreement specified the percentage of the management fees she was entitled to.

Because there is an express agreement that governs the subject matter of the claim, Arience's motion for summary judgment dismissing Bar-Tur's unjust enrichment or quantum meriut claim is granted.

### Promissory Estoppel

It is well-settled that New York does not recognize a separate claim for promissory estoppel. Rojo v. Deutsche Bank, 2010 U.S. Dist. LEXIS 62796 *23 (S.D.N.Y. June 23, 2010) (collecting cases) (citations omitted). Therefore, Arience's motion for summary judgment as to Bar-Tur's promissory estoppel claim is granted.

### Breach of Implied Covenant of the Duty of Good Faith and Fair Dealing

Bar-Tur further alleges that Arience breached its implied duty of good faith and fair dealing by terminating Bar-Tur in order to avoid paying her a management fee in 2008.

Under New York law, breach of the implied duty of good faith and fair dealing is "merely a breach of the underlying contract." National Market Share, Inc. v. Sterling Nat'l Bank,

392 F.3d 520, 525 (2d Cir. 2004) (citations omitted). As discussed supra, Arience did not breach

its contract with Bar-Tur. Therefore, Arience is entitled to summary judgment dismissing Bar-

Tur's implied duty of good faith and fair dealing claim.

### New York Labor Law Claim

Bar-Tur alleges that she was an "employee" of Arience and that the management

percentage and incentive percentages distributions constitute "back wages" that are owed to her

pursuant to New York Labor Law § 190, which requires employers to pay their employees

wages owed. See Compl. ¶¶ 50-54, N.Y. Labor Law § 190 et seq. Bar-Tur's New York Labor

Law claim is predicated on her breach of contract theory. See Amend Compl. ¶ 129. Under New

York law, Bar-Tur cannot assert a breach of New York's Labor Law when she had "no

enforceable contractual right to those wages." Tierney v. Capricorn Investors, L.P. 189 A.D.2d

629, 632 (N.Y. App. Div. 1993). As discussed supra, Bar-Tur is not entitled to any further

management distributions under her agreement with Arience. Therefore, Arience's motion for

summary judgment as to Bar-Tur's New York Labor Law claim is granted.

### 2007 Compensation Claim

Bar-Tur contends that she was underpaid in 2007 because she did not receive her the

contractually required 5.00% of Arience's management fees and incentive allocations. The

Letter Agreement states that Bar-Tur was entitled to 5.00% of "incentive fees received by the

Management Company and the incentive allocations received by the LLC." Bar-Tur contends

that this means that any incentive fees that Arience took possession of after March 1, 2007

should be factored into Bar-Tur's total compensation. Arience, however, calculated her 2007

compensation by reducing her allocation by any fee that Arience earned before Plaintiff started,

even where payment was received after Bar-Tur began working there. See Gennaro Aff. ¶ 4.

11

Summary judgment is appropriate if the contract has a definite and precise meaning. See Law Debenture Co, 595 F.3d at 467. If the terms of the contract are susceptible to two reasonable meanings, then summary judgment should not be granted. Id. A dispute between the parties does not mean there are multiple reasonable interpretations. Id. Here, it is not reasonable to interpret the word "receive" as Bar-Tur contends. It would be unreasonable to assume that Bar-Tur would be entitled to incentive fees earned months before Bar-Tur arrived at the firm without any effort on her part, simply because the funds were received a fiscal year that ended after Bar-Tur arrived. It is unreasonable to read her contract so narrowly. Plaintiff did not earn incentive fees on income generated prior to her employment. Therefore, summary judgment in Defendant's favor is appropriate on Bar-Tur's claim for breach of contract for her 2007 compensation.

### Discrimination on the Basis of Disability under the ADA

When seeking relief under the Americans with Disabilities Act, the plaintiff has the initial burden of establishing a prima facie case of disability discrimination. See McDonnell Douglas Corp. v. Green, 411 U.S. 792, 801 (1973). It is undisputed that under the McDonnell Douglas burden shifting analysis, Bar-Tur must establish, by a preponderance of the evidence: (1) Bar-Tur is a person with a disability under the meaning of the ADA; (2) an employer covered by the statute had notice of such disability; (3) with or without reasonable accommodations, plaintiff could perform essential functions of the job at issue; (4) Arience took adverse employment action against her. See id. at 802; McBride v. BIC Consumer Prods. Mfg. Co., 583 F.3d 92, 96-97 (2d Cir. 2009). If a plaintiff establishes an initial prima facie claim of discrimination, the burden of production then shifts to the employer to demonstrate a legitimate, nondiscriminatory reason for the employment decision. McDonnell Douglas, 411 U.S. at 802. If

12

the employer has met this burden, the burden shifts back to the plaintiff to demonstrate, by a preponderance of the evidence, that the nondiscriminatory reason was merely pretext for discrimination. Id. at 804-05.

Under the ADA, a person is disabled when they have a "physical or mental impairment that substantially limits one or more of the major life activities of such individual." 42 U.S.C. § 12102(2) (1995). The regulations define a "major life activity" as: "functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." 29 C.F.R. § 1630.2 (2001). An impairment "substantially limits" such activities when, among other things, the disabled person is "unable to perform a major life activity that the average person in the general population can perform" or is "significantly restricted as to the condition, manner or duration under which an individual can perform a particular major life activity as compared . . . to an average person." Id. at § 1630.2(j)(1). The statute also lists various factors to consider including: "(I) the nature and severity of the impairment, (ii) the duration or expected duration of the impairment, (iii) the permanent or long term impact . . . resulting from the impairment."Id. at § 1630.2(j)(3)(1); see also, Colwell v. Suffolk County Police Dept, 158 F.3d 635, 643-44 (2d Cir. 1998). Bar-Tur contends that she is disabled under the ADA because she has substantial difficulty breathing, sleeping, speaking and getting pregnant.

It is undisputed that Bar-Tur's CVID constitutes a physical impairment. It interferes with the specifically enumerated major life activities of breathing, sleeping and speaking.[2] However,  Bar-Tur fails to carry her burden of establishing as a matter of law that her

---

[2] Bar-Tur contends that her inability to get pregnant constitutes a substantial limitation of a major life activity. However, her inability to reproduce arises not from her CVID but from

CVID *substantially impacts* her ability to breath, sleep or speak.[3] In her declaration, Bar-Tur states that her "breathing is limited" and she "struggle[s] to breathe." Bar-Tur Decl. ¶¶ 19-20. She further states that she "regularly suffered" from sinus infections and flu-like symptoms. Id. As to speaking, she states in her affidavit that she has a "persistent cough" and provides one example of how she could not sing in a Christmas pageant because she was coughing. Id. at 22.

She also states that she "could not sleep." Id. at 21. However, she was still able to maintain an active lifestyle. Bar-Tur testified at her deposition that she "used to go for runs after work" and went to "yoga at 6:30 am on Fridays." Chinn Decl. Ex 1 at 305:13-21. She self-reported to her doctors that she, in essence, had monthly sinus infections. Chinn Decl. Ex. 28 ("She reports monthly or bimonthly bronchitis"); Ex. 34 ("she has been getting mostly sinus infections monthly"); Ex, 37 ("she has significant chronic rhinosinusitus . . . requiring almost monthly antibiotic). Other than these few references, the record is bare with respect to evidence of the nature, severity and duration of Bar-Tur's alleged impairment. As Bar-Tur's counsel admits: "there is no evidence of how often [she has trouble sleeping]." and "there is nothing in the record that says how often [her inability to speak] occurred." Oral Arg. Tr. at 143. For example, as to her inability to sleep, Bar-Tur offers no evidence that she had any greater difficulty failing asleep because of her CVID than any other adult in the general population. See

_____

medication she took to mitigate CVID's effects. See Oral Arg. Tr. 132:23-133:1. Given the temporary nature, it only lasted until she switched to IVID treatments, it does not qualify as a disability under the ADA. See McNamara v. Tourneau, Inc., 496 F. Supp. 2d 366, 375-76 (S.D.N.Y. 2007). Further, Bar-Tur points to no cases where an ADA-protected disability can be created by the side-effects of taking medication for another medical condition.

[3] This Court knows of only one other case that addresses whether CVID is a qualified disability under the ADA. Henderson v. New York Life, Inc., 991 F. Supp. 527 (N.D. Tex. 1997). There, the District Court also held that CVID did not constitute a disability under the ADA. See id. at 538.

Colwell, 158 F.3d at 644 (finding that "difficulty sleeping is extremely widespread" and that a plaintiff must show that her affliction is "worse than suffered by the general population."). As to her inability to breathe, her moderately active lifestyle weighs heavily against finding that she is substantially limited in her ability to breathe. See Muller v. Costello, 187 F.3d 298, 314 (2d Cir. 1999) (finding that when plaintiff participated in sports outside of work, it "cut against his claim for disability.").

Under McDonnell Douglas, Bar-Tur has the initial burden of proving that her impairment rises to the level of a disability under the ADA and should she fail to meet that burden, summary judgment can be properly entered against her. See McBride, 583 F.3d at 103. Because Bar-Tur has offered insufficient evidence in support of her claim that she has a substantial impairment of a major life activity, Defendant's summary judgment motion as to her ADA discrimination claim is granted.

Even if her CVID qualified as a disability, Defendants have articulated a non-discriminatory reason for Plaintiff's termination. Plaintiff has not proffered any evidence establishing that it was pretextual. It is clear that Arience took adverse employment action against Bar-Tur when it terminated her and Bar-Tur, with her long experience in finance, could perform the essential elements of her job.[4] See McBride, 583 F.3d at 98-101.

Even if Plaintiff met her prima facie burden, the burden of production shifts to Defendants to "offer through the introduction of admissible evidence a legitimate non-discriminatory reason for the discharge[] and the plaintiff must then produce evidence and

---

[4] Defendants contend that Plaintiff was not qualified for her position because her job performance was not satisfactory. This is not part of Plaintiff's prima facie case. See Slattery v. Swiss Reinsurance America Corp., 248 F.3d 87, 91 (2d Cir. 2001). Rather, all Plaintiff must show is that she possesses "the basic skills necessary for the performance of the job." Id.

carry the burden of persuasion that the proffered reason is a pretext." Sista v. CDC Ibis North America, Inc., 445 F.3d 161, 168 (2d Cir.2006). Defendants have satisfied its burden by proffering evidence that it was unhappy with Plaintiff's job performance and that she went about her job differently than her superiors would have liked. The record indicates that throughout her time at Arience, Bar-Tur was criticized for staying in her office too often and not communicating with senior staff, holding on to her stock models too long, not being a leader and not being decisive about her stock picks. See Chinn Decl. Ex 1 at Tr. 93:21-94:6, 102:21-23, 128:18-25, 129:1-9, 130:12-25, 131:1-25, 132:1-5, Ex 2 at Tr. 94:20-25, 95:1-23, 96:12-21, 106:16-24, 140:5-25, Ex 14, Ex. 16, Ex. 17, Ex. 19, Ex. 30, Ex. 31, Ex. 32. The undisputed record more than establishes that Arience had a legitimate, nondiscriminatory reason for dismissing Bar-Tur. See Slattery, 248 F.3d at 91 (a strong record that Plaintiff "went about his job differently from the way his superiors would have liked" is sufficient to establish a legitimate rationale for termination); Nathe v. Weight Watchers Int'l, 2010 WL 3000175, at *4 (S.D.N.Y. Jul. 26, 2010).

Plaintiff does not provide any evidence that suggests that Bar-Tur's termination was pretextual. To defeat summary judgment, Plaintiff must "establish a genuine issue of material fact . . . as to whether the employer's reason for discharging her is false and as to whether it is more likely that a discriminatory reason motivated the employer to make adverse employment decisions." Valentine v. Standard & Poor's, 50 F. Supp. 2d 262, 282 (S.D.N.Y. 1999) (Sotomayor, J.). A decision cannot be a pretext for discrimination unless it is shown to be both false and that discrimination is the real reason. St. Mary's Honor Center v. Hicks, 509 U.S. 502, 515-16 (1993). Plaintiff must present sufficient evidence that would allow a reasonable jury to believe Plaintiff's explanation of discrimination. Tasbas v. Nicholson, 2009 WL 1458463, at *16 (W.D.N.Y.  May 26, 2009) (quoting James v. New York Racing Ass'n, 233 F.3d 149, 156 (2d

16

Cir.2000)) Plaintiff has not proffered any evidence that implies that her demotion and eventual termination was for false reasons or that discrimination was the real reason. As even Bar-Tur understood it, she was terminated because she refused to accept new employment terms. She was demoted because senior managers were dissatisfied with her performance. Further, there is no causal link between the few isolated comments senior managers at Arience may have made about her health and doctor appointments and her demotion and termination. Plaintiff's work performance was criticized throughout her time at Arience. A few references to her health, in conjunction with her family and financial problems, simply does not amount to a record of discrimination. See Valentine, 50 F. Supp. 2d at 282.

### Being Regarded as Disabled under the ADA

In the alternative, Bar-Tur contends that even if she is not disabled, she is entitled to recover because Arience "regarded her" as disabled. See 42 U.S.C. § 12102 (2)(A), (C) (2001). It is not enough that Arience regard her as disabled, rather, Arience must regard her as disabled "within the meaning of the ADA." Colwell v. Suffolk County Police Dep't, 158 F.3d 635, 646 (2d Cir. 1998); Francis v. City of Meriden, 129 F.3d 281, 285 (2d Cir. 1997). In other words, Arience must have perceived Bar-Tur to have a "substantially limiting impairment" that effects a "major life activity." See id.  Whether an employer perceives an employee as disabled "turns on an employer's perception of the employee, a question of intent, not whether the employee has a disability." Francis v. City of Meridien, 129 F.3d 281, 285 (2d Cir. 1997). Failure to meet the "regarded as" disabled prong alone warrants dismissal. See Giodorano v. City of New York, 274 F.3d 740, 746 (2d Cir. 2001); Dellavolpe v. City of New York, 673 F. Supp. 2d 111, 120 (E.D.N.Y. 2009).

17

Bar-Tur has not proffered any evidence that points to Arience having regarded Bar-Tur as having a substantially limiting impairment. She has only proffered evidence that demonstrates that Arience was *aware* that Ms. Bar-Tur had certain health problems. There are references in the record to conversations Ms. Bar-Tur had with Ms. Seidman-Becker about headaches, colds and lack of sleep. See Chinn Ex. 53 ("sorry re headaches."); Ex. 38 ("I can't wait to feel normal again."); Ex. 33 ("I developed full blown sinus infections and have been lying low.");Ex 27 ("I am . . . highly focused on finding out what the f?*# is going on [referring to her chronic illness]). Ms. Seidman-Becker testified at deposition that Ms. Bar-Tur did not appear to be sick that often and she had "on-and-off" colds. Chinn Decl. Ex 2 at Tr. 114:7-19. It is clear that Ms. Seidman-Becker was aware that Ms. Bar-Tur had health problems and was sick often. However, what the record does not in anyway establish is that Ms. Seidman-Becker or anyone else at Arience perceived Ms. Bar-Tur as having a substantial limitation in any major life activity. Because Bar-Tur has failed to meet the low burden under McDonald-Douglas, Arience is independently entitled to summary judgment as to Bar-Tur's perceived disability claim.

### Retaliation Claim

To establish a claim for retaliation, Plaintiff must establish by a preponderance of the evidence that: "[1] participation in a protected activity known to the defendant; [2] an employment action disadvantaging the plaintiff; and [3] a causal connection between the protected activity and the adverse employment action." Slattery, 248 F.3d at 94. Once a Plaintiff has met its burden, then Defendants must proffer a legitimate, nondiscriminatory reason for its adverse action. Id. Plaintiff may rebut this by showing that such a reason was pretexual. Id.

Having already found that Defendant has proffered a non-discriminatory reason for its adverse action that was not pretextual, Plaintiff's retaliation claim should be dismissed. Further, Plaintiffs have not shown that there is a causal connection between any protected activity and the adverse employment action. It is assumed that the protected activity was Bar-Tur's counsel's letter stating that they had "deep concerns that Arience is seeking to alter the terms and conditions related to Ms. Bar-Tur's employment after she raised issues related to her medical condition, which would violate federal, state and city laws." However, Plaintiff has failed to establish a causal link between this and her termination. See Murray v. Visiting Nurse Servs, 528 F. Supp. 2d 257, 277 n. 14 (S.D.N.Y. 2007) (temporal proximity is not sufficient to support a retaliation claim without more). There is not a single piece of evidence that suggests Bar-Tur was terminated after that e-mail because she complained about disability discrimination. Arience had already informed her that if she did not accept the new terms of her employment she would be terminated. Her lawyer thereafter indicated in that e-mail that Ms. Bar-Tur would not accept those terms. She was not terminated because she claimed she was being discriminated against; rather, she was terminated because she refused to accept these terms. Even Ms. Bar-Tur understood that she was terminated because she refused to accept these terms and not because she was complaining of disability discrimination. Chinn Decl. Ex. 1 at Tr. 331:5-9.

**Discrimination and Retaliation Claim Under New York State Humans Rights Law ("NYSHRL") and New York City Human Rights Law ("NYCHRL").**

A disability discrimination claim under the NYSHRL and NYCHRL is analyzed under the same McDonnell Douglas framework as an ADA claim. See Rodal v. Anesthesia

Group of Onondaga, P.C., 369 F.3d 113, 117 n.1 (2d Cir. 2004).  Weinstock v. Columbia, 224 F.3d 33, 42 n.1 (2d Cir. 2000).

       While Plaintiff may not be disabled under the ADA, New York's disability law is broader. Under the NYSHRL, a disability is "a physical, mental or medical impairment resulting from anatomical, physiological, genetic or neurological conditions which prevents the exercise of a normal bodily function or is demonstrable by medically accepted clinical or laboratory diagnostic techniques or (b) a record of such an impairment or (c) a condition regarded by others as such an impairment." N.Y. Exec. Law § 292(21); Reeves v. Johnson Controls World Servs., Inc., 140 F.3d 144, 154-55 (2d Cir.1998). Under the NYCHRL, a disability is "any physical, medical, mental or psychological impairment, or a history or record of such impairment." N.Y. Admin. Code § 8-102(16)(a). As CVID is a deficiency of the immune system, it fits both of these broader definitions.

       However, because Plaintiff has failed to proffer sufficient evidence that her demotion and termination were pretextual or motivated by discriminatory animus, Defendant is also entitled to summary judgment on these claims. Brief v. Albert Einstein College of Medicine, 2010 WL 2271438, at * 7 n.11 (S.D.N.Y. Jun. 2, 2010); Pacenza v. IBM Corp., 2009 WL 890060, at *17 (S.D.N.Y. April 2, 2009).

## Conclusion

Defendant's motion for summary judgment is granted. Plaintiff's case is dismissed.

Dated: New York, New York
       February 9, 2011

SO ORDERED:

GEORGE B. DANIELS
United States District Judge